UNITED STATES

v.

**Staff Sergeant Woodrow HOWARD, Jr.,
FR 458–94–5787, United States
Air Force.**

**ACM 26224.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 17 June 1987.

Decided 3 Feb. 1988.

Appellate Counsel for the Appellant: Colonel Leo L. Sergi and Captain Lynne H. Wetzell.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni, Lieutenant Colonel Morris A. Tanner, Jr. and Lieutenant Colonel Robert J. Webster, USAFR.

Before SESSOMS, LEWIS and BLOMMERS, Appellate Military Judges.

## DECISION

BLOMMERS, Judge:

Tried by general court-martial, military judge sitting alone, the appellant stands convicted, despite pleas to the contrary, of the theft of $1,040.00. The sentence, as adjudged and approved, extends to a bad conduct discharge, confinement for 13 months, forfeiture of $438.00 pay per month for 13 months, and reduction to airman basic. The appellant contends the evidence is insufficient to support a finding of guilty. On the record before us, we agree.

From about 1200 hours on Saturday, 14 March 1987, until 0700 hours on Sunday, 15 March 1987, the appellant served as the Charge of Quarters (CQ) for his squadron. Three CQ "runners", basic trainees, serving two-hour shifts, worked for the CQ. The CQ station (desk area) was at the mid-point of a long hallway, referred to as the "tunnel", on the ground floor of the squadron building. Directly adjacent to the CQ station and running perpendicular to the long hallway was a short hallway. The ground floor housed all the squadron offices. The second office on the right side of the short hallway, about 20–30 feet from the CQ station, was occupied by Technical Sergeant (TSgt) Davis, who was in charge of squadron Military Drill and Ceremonies (MDC). The appellant was one of the squadron's military training instructors. The unit is part of the Air Force Military Training Command at Lackland Air Force Base, Texas. TSgt Davis was also the president of the Blue Warriors Association, which maintained a morale and welfare type fund for the squadron.

On Saturday, 14 March 1987, the Association was raising funds by selling candy bars at a command sponsored softball tournament. That morning, TSgt Davis testified, he placed about $200 of the proceeds from the sales in a metal, gym type, wall locker (about six feet high) located in his office. Having concluded their fund raiser, TSgt Davis and a Sergeant Hernandez returned to the squadron building at about 1600 hours that afternoon to count the money. The counting took place in the MTID room (not further identified) which

was located outside the tunnel area. TSgt Davis went to his office to get the 200 or so dollars he had secured there earlier in the day. On the way back to the MTID room, he passed the CQ desk where the appellant was sitting, flashed the money he was carrying, and remarked: "See the money that we made at the softball tournament." The appellant replied, "I could use some of that money." (Based on the testimony of record, we do not find any particular significance in this remark as related to the offense in question.) After counting the money, it totalled $1,040.00, TSgt Davis returned to his office. He testified he could not recall if he even saw the appellant on his way back. He placed the money inside a bank money bag, which he put inside a metal cash box, with dimensions of about 12" × 6" × 6", which could not itself be secured. He placed the cash box on the top shelf of the wall locker, and locked the door using a Master combination lock. He testifies that he is absolutely certain the lock was secure when he left at about 1700 hours. There is no evidence as to what other property, if any, was stored in the locker. TSgt Davis did return to his office on one occasion that weekend, for a brief 5–10 minute period on Sunday morning before going to church. He testified he did not look at the locker during this visit. He returned to work on Monday, 16 March 1987, at about 0700 hours. At around 1000 hours he thought about taking the money to the bank, and looked at the locker. He discovered the combination lock, cash box, bag, and money were gone. He reported the theft to the commander and first sergeant. None of these items nor any of the money was ever recovered. There were no signs of forced entry into the locker.

The evidence is clear that the appellant was in TSgt Davis' office alone on several occasions during his shift as the CQ, on one occasion for perhaps as long as 20–30 minutes, and on the others for 10 minutes or less. One of the CQ runners testified that on one occasion the appellant was in the office with the door closed. The appellant testified he made phone calls from the office and used it for business purposes related to his job as a training instructor. TSgt Davis indicated that there was no reason for the CQ to use his office, but he had never told CQs they could not do so. The office doors were, as a rule, not locked during non-duty hours. (We presume that the CQ would in any event have access to a master key or set of keys to every room in the building.) From a consensus of the testimony at trial, we conclude that it was not unusual for CQs to go into one of the offices to make a phone call, use a typewriter, or for some other legitimate purpose. However, most of the witnesses who had performed CQ duty in the past testified they would use their section supervisor's office rather that the MDC's office (TSgt Davis'). At least one of the CQ runners was required to be at the CQ station at all times, and there is no indication that was not the case during the appellant's tour of duty as CQ that weekend.

Five CQ runners who worked various two-hour shifts while the appellant was CQ testified. From their collective testimony it appears that there was a clear view down the short hallway from the CQ station, that if someone had tried to forcibly enter the locker in TSgt Davis' office any noise created thereby would most probably be detectable from the CQ station, that it was a quiet night and there were no unusual occurrences during their shifts, and that the appellant acted normally. One of the CQ runners stated that at about 0200 hours Sunday morning, he observed the appellant exit the short hallway and walk into the CQ sleeping area off the long hallway to the left of the CQ station. Although the lighting was not good, he saw what appeared to be a towel or bag of some kind in the appellant's hand. The appellant testified he did not have a towel or bag of any kind in his possession during his tour of duty as CQ. Sometime after 0200 hours that morning, the appellant called the CQ runners into TSgt Davis' office to try to lift up the wall locker where, according to TSgt Davis, the money was stored. He was looking for a brush or some other type cleaning utensil he thought might be in a cardboard box located under the locker. One of the runners testified there was no lock on the

locker at the time, another could not recall whether there was or wasn't. The appellant testified he wasn't specifically concerned about a lock on the locker, but is sure it was locked throughout the night. He denied taking the money in question. A cleaning crew comes through the building and offices every day. The only direct evidence as to when they came through on Saturday came from the appellant, who testified it was about 1730 hours.

Shortly after being relieved as CQ Sunday morning, the appellant stopped by a friend's house on base and borrowed three dollars for gas for his car. After being interviewed by the security police concerning the theft on Monday afternoon, 16 March, he borrowed two dollars from another acquaintance in exchange for some NCO Club chits. (At first blush it might seem unlikely an individual who just took over a thousand dollars, mostly in bills of small denomination, would act in this manner. On the other hand, these could be the actions of a cunning thief.)

The appellant's commander testified that the appellant had been experiencing financial problems since early in February 1987. Prior to 15 March 1987, 17 checks, totalling about $1150.00, SSgt Howard had uttered were returned for insufficient funds. The commander was also contacted by a credit company concerning an overdue loan. As of the time of trial, to the commander's knowledge only five of the checks had been cleared up, and he was absolutely certain the loan was still outstanding. (The military judge considered this testimony on the issue of motive only: "In so far as the testimony would go to show that the accused may or may not have been in financial need." We will do likewise.) Finally, an equal number of witnesses testified they would or would not believe the accused under oath.

Under Article 66(c) of the Uniform Code of Military Justice, 10 U.S.C. § 866(c), we are tasked with finding factual as well as legal sufficiency. As the Court of Military Appeals very recently stated, the test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of Military Review are themselves convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324 (C.M.A.1987). The standard instruction defining reasonable doubt is in part as follows:

By "reasonable doubt" is intended not a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence *or lack of it* in the case. It is an honest misgiving caused by insufficiency of proof of guilt. Proof beyond reasonable doubt means proof to a moral certainty although not necessarily an absolute or mathematical certainty. A "reasonable doubt" is a doubt which would cause a reasonably prudent person to hesitate to act in important and weighty personal affairs. The proof must be such as to exclude not every hypothesis or possibility of innocence *but every fair and rational hypothesis except that of guilt....* (*Emphasis added.*)

Army Pamphlet 27–9, Military Judges' Benchbook, para. 2–29.1 (1 May 1982) (Change 1, 15 February 1985). As is obvious from the above factual summary, this is a case built upon circumstantial, not direct, evidence. No one saw the appellant breaking into the locker, nor was he subsequently found in possession of any of the missing property. We are certainly mindful that the law makes no distinction between the relative value of these two types of proof.[1] However, after a most careful review of the record, recognizing that the

---

1. It is of interest to note that we have been unable to find a single reported military theft case where there is not at least some evidence which tends to physically connect the accused with the wrongful taking or the subsequent exercise of some type of control over the property taken. *See, e.g., United States v. Odegard*, 25 M.J. 140 (C.M.A.1987); *United States v. DiCupe*,

21 M.J. 440 (C.M.A.1986); *United States v. Dammerich*, 9 U.S.C.M.A. 439, 26 C.M.R. 219 (1958); *United States v. Lee*, 22 M.J. 767 (A.F.C.M.R.1986); *United States v. White*, 19 M.J. 662 (C.G.C.M.R.1984); *United States v. Bollig*, 49 C.M.R. 877 (A.F.C.M.R.1975); *United States v. Miller*, 26 C.M.R. 673 (A.B.R.1958).

trial court saw and heard the witnesses, we nevertheless conclude that the government did not meet its burden of proof.

It is quite clear that the appellant had the opportunity (i.e., his repeated use of TSgt Davis' office) and a possible motive to take the money (his financial difficulties).[2] Financial difficulties, however, do not a thief make. Totally lacking is any evidence that: the appellant knew TSgt Davis had placed any money in the locker in his office on 14 March 1987, or whether it was common practice for Blue Warriors Association funds, or any monies for that matter, to be kept in the building or in this particular locker[3]; he knew the lock combination (in fact the evidence is almost conclusive that he did not; only the three officers of the Association knew the combination, and the appellant was not one of them); there was any change in the appellant's financial situation or spending habits after the theft. TSgt Davis was absolutely steadfast in his testimony that the lock was secure before he left his office late Saturday afternoon. Presuming he did put the money in the locker, and applying common sense, our knowledge of human nature and the ways of the world, we find it unlikely that the appellant, through luck or stealth, could have figured out the combination to this type of lock, considering the amount of time he spent in the office (at the outside perhaps an hour to an hour and a half). There was testimony that a large bolt cutter was kept in the first sergeant's office (located on the long hallway to the left of the CQ station). Further, we will presume, although there is no evidence to so indicate, that as CQ, and one who had pulled CQ duty in the past, the appellant knew they were there. Again, however, it is unlikely that the appellant could have taken the bolt cutter from the first sergeant's office past the CQ station to TSgt Davis' office, cut off the lock, and returned the bolt cutter, or in any other way forcibly broken into

the locker, without such action being observed or heard by the CQ runner sitting at the CQ station.

Based upon the evidence of record, we are not convinced beyond a reasonable doubt of the appellant's guilt. *See United States v. Harville*, 14 M.J. 270 (C.M.A. 1982); *United States v. Owens*, 16 M.J. 999 (A.C.M.R.1983). Our decision renders the remaining assignments of error moot. The findings of guilty and the sentence are set aside, and the charge is dismissed.

Senior Judge SESSOMS and Judge LEWIS concur.

---

2. Indeed, his R.C.M. 1105 post-trial submission to the convening authority included a financial statement listing some $14,700.00 in outstanding debts to credit unions, finance companies and merchants.

3. The appellant's performance reports indicate he was an avid supporter of the Association, which, with perhaps a little fleshing out, might have led to an inference that SSgt Howard knew how Association funds were handled. But this information was not introduced until the sentencing portion of the trial.