**UNITED STATES**

v.

**Technical Sergeant Richard J. STIDMAN, FR 527–92–6011, United States Air Force.**

**ACM 27833.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 28 April 1989.

Decided 25 Jan. 1990.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Major Ronald G. Morgan.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Major Terry M. Petrie and Captain Morris D. Davis.

Before BLOMMERS, KASTL and MURDOCK, Appellate Military Judges.

## DECISION

KASTL, Senior Judge:

In this child abuse case, the testimony of the prosecutrix directly contradicts that of the appellant and his witnesses. After meticulous analysis, we are not persuaded that the evidence is sufficient to prove the appellant's guilt beyond a reasonable doubt. Accordingly, we reverse his conviction for sodomy and indecent acts upon a child, violations of Articles 125 and 134, UCMJ, 10 U.S.C. §§ 925, 934.

The appellant, a career noncommissioned officer, was found guilty by members despite his pleas. His sentence is a bad conduct discharge, confinement for five years, and reduction to sergeant.

### The Government's Case

The prosecution's case-in-chief is comprised of the testimony of two witnesses: (a) the prosecutrix, TS, now 16, who stated under oath that her father had sexually abused her; and (b) Dr. Worley, a clinical psychologist with experience in over 100 child abuse cases. Dr. Worley diagnosed TS as having a post-trauma stress syndrome which could well have been caused by sex abuse. On cross-examination, Dr. Worley conceded that the syndrome could also be caused by anxiety, fearfulness, or the like. There was no physical evidence introduced.

### The Defense Case

The defense effort in this case can be divided into nine discrete areas:

1. TS's poor character. TS was pictured as a troubled, rebellious teenager who lied to get even with her strict parents. TS has smoked marijuana over 20 times; she drinks, smokes cigarettes, and has been intimate with four boys. She has had an abortion. TS has run away from home many times. She has poor grades and a reputation as a liar. According to the defense theory, TS's story—like the nose of Pinocchio—expanded every time she told her story until it eventually engulfed her innocent father, the appellant.

2. The absence at trial of those who witnessed events in North Carolina and Arizona. This court-martial occurred at Little Rock Air Force Base, Arkansas. At trial, TS stated that at a prior assignment in Arizona, she had informed both Mrs. T (her teacher) and Mrs. M (her social worker) about being abused. She also told girls named Connie and Brenda. She further related that her father once sexually assaulted her in North Carolina while her sister Shannon was present. The prosecution never called any of these individuals to the stand, even though they might have been able to thwart the defense effort to show TS's story as a recent fabrication.

See Mil.R.Evid. 801(d)(1)(B); *United States v. Jones,* 26 M.J. 197, 199–200 (C.M.A.1988); *United States v. Meyers,* 18 M.J. 347 (C.M.A.1984); *United States v. Allen,* 13 M.J. 597 (A.F.C.M.R.1982).

3. TS and Susan H. Susan H is a civilian air traffic controller at the Minneapolis airport; she used to work for the appellant and was a confidant of TS. One day, TS played hookey from school. According to TS's sworn testimony, she told Susan "everything." TS claimed that Susan, hearing the story of the appellant's sexual shenanigans—including cunnilingus—responded by exclaiming: "Oh, my God." At trial, Susan H testified for the defense. She said that all TS ever revealed was a self-satisfied indication that she possessed some dark secret pertaining to both her parents and that the appellant "did something to her" back in Arizona. Susan testified that if she had suspected any sexual wrongs, she would have acted. [Yet she did not.]

4. TS and Melissa. Melissa is a high-school senior and former friend of TS. TS said at trial that she had, *on eight or nine occasions,* revealed numerous details to Melissa about her sexual encounters with the appellant. Melissa's version on the stand was that TS spoke in generalities and that she did not completely believe TS. Melissa further stated that TS had asked her to lie in an Office of Special Investigations inquiry about a sexual proposition the appellant had supposedly made toward TS during a camping trip. Melissa stated that TS is a liar.*

5. TS's other friends. TS supposedly complained about the appellant's advances to several others—two girlfriends, two boys named Jimmy and Harry (aka Buster), and another girl named Jessica. Yet except for Jessica (a character witness for TS), and despite the defense claim of recent fabrication and a tale getting better all the time, the prosecution failed to call any of these individuals to confirm whether TS's

---

* In addition, in post-trial submissions, Melissa appears to support the appellant's innocence. Melissa "can't believe that [TS] testified against her father. It is because she has ran [sic] away

a lot while at her parent's home, mostly on weekends. She did this to be free to go out, party and have a good time."

past "prototype" story was consistent with what she was stating in court. *See generally* DA Pam 27–22, *Military Criminal Law Evidence*, paragraph 7–5d (15 July 1987).

6. TS and her social worker. At Little Rock, before the alleged sexual abuse came to the attention of the authorities, TS's parents initiated therapy for TS and took her to see Mr. Mike Terry, a social worker. TS and Mr. Terry had four private sessions without the appellant or his wife being present. Mr. Terry asked TS if she had ever been "abused." He explained in court that he was probing for physical abuse, not sexual abuse. TS had a chance to respond and ask for help; she never did. Mr. Terry concluded that TS is a "powerful child" and has perhaps stronger will-power than her mother. The defense argued that if the appellant were a child molester, he would have done virtually anything to keep TS away from a therapist seeking to explore the roots of the child's malaise. Further, the defense contended, the fact that the child never "spilled the beans" of sexual abuse to Mr. Terry following his specific inquiry is an indicator that TS's story was a fabrication. For her part, TS indicated that she was uncomfortable with Mr. Terry and thus did not trust him enough to confide her problem.

7. TS and her mother. This is a significant part of the case: A believer might say that it makes either TS or her mother a candidate for hellfire. In effect, TS testified that in North Carolina, she had told her mother about the appellant's abuse anywhere between three to eight times; that she had complained to her mother in Arizona from "a couple" to five times; and that in Little Rock, she had told her mother three or four times. The total times she went to her mother, TS averred, was 15 to 20 times. The mother testified that these conversations never happened; to the contrary, she insisted, TS never complained. The mother testified that the appellant may have accidentally touched one or another of their four children while playing, for they are an enthusiastic and demonstrative family. Yet everything was aboveboard, the mother insists. Once the appellant accidentally touched TS's breast during a wrestling match with all the children; he apologized. If TS had ever complained of the appellant's sexual abuse, the mother insisted that she would've remembered: "You can bank on that."

8. TS's earlier complaint and recantation. Following TS's complaints to her teacher and social worker in Arizona, as indicated in Item 2 above, the matter was investigated. The appellant moved out of the house so that the children might stay. TS recanted. She now states she did so because her mother begged her not to split up the family. In any event, the authorities permitted the appellant to return home. There is no further data in the record as to what did or did not happen in Arizona.

9. The family. Numerous witnesses from the maternal side of the family rallied around the appellant, testifying that both the appellant and Mrs. Stidman can be relied upon to tell the truth. Several also say that TS is untruthful. Karen P testified that she was a friend who had lived with the family for a year when she was 13 or 14 and there never was any suggestion of the appellant acting improperly. No family members testified that TS had confided to them of abuse by the appellant.

### Other Matters

With the case in such equipoise and given the fact that the voting members saw and observed the parties, we have taken pains to consider even the smallest indicia in the record which might suggest the accused's guilt or innocence. We note, for example, something of possible value concerning Mrs. Stidman. Her testimony reveals a self-reliant woman who works outside the home, albeit not at a lucrative job. Both she and her relatives live within a reasonable distance of each other; it appears that she would not be destitute if her husband's conviction were approved. To the contrary, the record suggests a strong, dynastic family which gathered around the mother to take her side in this case. Theoretically at least, Mrs. Stidman is not the

type to tolerate incest because she has no other place to turn.

Furthermore, during their testimony both Dr. Worley and Mr. Terry commented that some experts believe there are 500,000 false reports of child abuse per year. We need not take the statistic as unerring to concede that false reports can occur—particularly when the complainant is a teen who supposedly knows more about "the facts of life" than would an infant.

Finally, we note that the defense successfully moved *in limine* to keep away from the members various other alleged *prior* misconduct—that the appellant supposedly asked TS to masturbate him at a drive-in; and that he invited fellatio and showed her the "white stuff" from his penis. We find it curious that the actions charged here are sodomy and indecent acts, but not masturbation or fellatio. One may find it difficult to believe that a child abuser, pictured by the prosecutrix as formerly engaging in masturbation or seeking fellatio, would now limit himself to indecent touching and cunnilingus.

### Our Standard on Review

 Under Article 66(c) of the UCMJ, 10 U.S.C. § 866(c), we must find factual as well as legal sufficiency. The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner,* 25 M.J. 324 (C.M.A.1987); *United States v. Howard,* 25 M.J. 843, 845–846 (A.F.C.M.R. 1988).

With Article 66(c) in mind, we opine that there are two kinds of courage involved in the profession of arms and the profession of law. On the one hand, many are called upon for physical courage. On the other hand, judges are called upon from time to time for moral courage—the courage to subordinate a personal philosophy of the law or private distaste of child abuse to decide an issue logically and dispassionately. In this case, recognizing that the voting members saw the participants at trial,

we assess the litigants as ending up in a "dead heat" as to credibility. Such an assessment is not enough to sustain a conviction, given our oath-bound duty under Article 66(c). Accordingly, after painstaking analysis and lengthy review, we are not convinced beyond a reasonable doubt of the appellant's guilt. *See United States v. Harville,* 14 M.J. 270 (C.M.A.1982); *United States v. Howard,* 25 M.J. at 845–846.

The findings of guilty and the sentence are set aside, and the Charges and specifications are dismissed.

Senior Judge BLOMMERS and Judge MURDOCK concur.